UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

MONER SALEH and JOSE HENRIQUEZ,

                                    Plaintiffs,

                    v.

DIGITAL REALTY TRUST, INC., PAUL BAMRICK,
and MANUEL PEGO, in their individual and professional
capacities,

                                    Defendants.

------------------------------------------------------------------------x

1:21-cv-09005-PAE

**AMENDED COMPLAINT**

Trial by Jury Demanded

Plaintiffs MONER SALEH and JOSE HENRIQUEZ (jointly, the "Plaintiffs"), by and through their attorneys, Eisner Dictor and Lamadrid P.C., and for their Amended Complaint against Defendants DIGITAL REALTY TRUST, INC. ("DLR" or "the Company"), PAUL BAMRICK, and MANUEL PEGO (collectively, "Defendants"), allege as follows:

## NATURE OF ACTION

1.    Plaintiffs brings this action seeking relief against Defendants for race and color discrimination and retaliation, in violation of the New York City Human Rights Law, New York City Administrative Code §§ 8-101, *et seq*. ("NYCHRL").

2.    The claims at issue in this matter involve Defendants' discriminatory mistreatment of Plaintiffs on account of their race and skin color.

3.    Defendants systematically targeted the Plaintiffs and other dark-skinned DLR employees by, *inter alia*, segregating the workplace based on skin color, unfairly targeting dark-skinned employees with discipline, creating a hostile work environment for dark-skinned employees, failing to promote the Plaintiffs and other dark-skinned employees, and demoting Plaintiff Saleh and other dark-skinned employees.

4.     Disheartened and demoralized by the disparate treatment they and their similarly situated dark-skinned colleagues were experiencing, each Plaintiff separately complained to Defendants about the discriminatory treatment.

5.     In blatant and egregious acts of retaliation, and notwithstanding each of the Plaintiff's respective nearly twenty (20) years of excellence working for Defendants, Defendants retaliated against the Plaintiffs after they opposed discrimination at the workplace, including, *inter alia*, terminating both Plaintiffs from their employment.

6.     Plaintiffs seek to remedy the harm that they suffered and continue to suffer as a direct and proximate consequence of workplace discrimination while working for Defendants, as well as the harm they suffered and continue to suffer as a direct and proximate consequence to unlawful retaliation, including but not limited to their unlawful terminations from their employment.

7.     Plaintiffs seek declaratory relief, monetary damages, and punitive damages for Defendants' violations of the NYCHRL, as well as all other remedies available to them.

## JURISDICTION AND VENUE

8.     Plaintiffs' discrimination claims arise under NYCHRL, Administrative Code of New York §§ 8-101, *et seq.*

9.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that it is a civil action in which the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

10.     Both Plaintiffs are residents and citizens of the State of New York.

11.     Defendant Digital Realty Trust, Inc. is not a citizen of the State of New York within the meaning of 28 U.S.C. § 1332(c)(1), and is a Maryland corporation with its principal place of business in the State of Texas.

12.     Defendant Paul Bamrick is not a citizen of the State of New York within the meaning of 28 U.S.C. § 1332, and is a resident and citizen of the State of New Jersey.

13.     Defendant Manuel Pego is not a citizen of the State of New York within the meaning of 28 U.S.C. § 1332, and is a resident and citizen of the State of New Jersey.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PROCEDURAL HISTORY

15.     On October 4, 2021, Plaintiff Saleh filed the instant action in the Supreme Court of the State of New York, County of New York, under the caption <u>Moner Saleh v. Digital Realty Trust, Inc. and Paul Bamrick, in his individual and professional capacity</u>, Index No. 159045/2021.

1.     On November 2, 2021, Defendants removed the instant action to this Court, on the basis of this Court's diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441 and 1446. (<u>See</u> Docket No. 1.)

2.     On December 9, 2021, Defendants served their Answer in this matter. (<u>See</u> Docket No. 11.)

3.     21 days later, on December 30, 2021, Plaintiff filed the instant Amended Complaint as a matter of course pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure.

## PARTIES

4.    Plaintiff MONER SALEH is an adult individual who resides in Kings County, New York.

5.    Plaintiff Saleh was employed by Defendants between 1999 and 2019.

6.    Plaintiff Saleh is a dark-skinned person of Arab ethnicity.

7.    Plaintiff JOSE HENRIQUEZ is an adult individual who resides in Duchess County, New York.

8.    Plaintiff Henriquez was employed by Defendants between September 2010 and November 30, 2021.

9.    Plaintiff Henriquez is a dark-skinned person of Hispanic ethnicity.

10.    Defendant DLR is a data center company and real estate investment trust that invests in carrier-neutral data centers and provides colocation and peering services.

11.    Defendant DLR is a Maryland corporation that is headquartered in Texas, with operations in the City of New York at: 32 Avenue of the Americas, New York, New York 10013; 60 Hudson Street, New York, New York 10013; and 111 8th Avenue, New York, New York 10011.

12.    Defendant PAUL BAMRICK is an adult individual who resides in the State of New Jersey.

13.    Defendant Bamrick is a White male.

14.    Defendant Bamrick was, at relevant times, Regional Operations Manager for DLR, and Plaintiffs' employer.

15.     At all times relevant to the claims at issue, Defendant Bamrick made personnel decisions on behalf of Defendant DLR, including decisions involving Plaintiffs, such as decisions related to hiring, demotions, promotions, and terminations.

16.     Defendant MANUEL PEGO is an adult individual who resides in the State of New Jersey.

17.     Defendant Pego is a White male.

18.     At all times relevant, Defendant Pego was a DLR manager and Plaintiff Henriquez's direct supervisor.

19.     At all times relevant to the claims at issue, Defendant Pego made personnel decisions on behalf of Defendant DLR, including decisions involving Plaintiff Henriquez, such as decisions related to hiring, demotions, promotions, and terminations.

## FACTUAL ALLEGATIONS

### *Background*

### Plaintiff Saleh

20.     Plaintiff Saleh was hired to work as a Customer Service Representative for Telx Group ("Telx") in 1999, where he was paid $10 per hour.

21.     In recognition of his dedication and excellent performance, Plaintiff Saleh would be continuously promoted over the next 18 years.

22.     In 2000, Plaintiff Saleh was promoted to Technician and briefly stayed in that title from 2000 through 2001.

23.     After receiving another promotion, Plaintiff Saleh became a Facility Maintenance Technician from 2001 through 2003.

24.     Plaintiff Saleh was then promoted to a supervisory role as Maintenance Supervisor which he maintained for six (6) years, from 2003 through 2009.

25.     Plaintiff Saleh's rise to the top continued when he was promoted to Data Center Operations Manager and maintained the duties and responsibilities in that title for the next eight (8) years, from 2009 through 2017, earning approximately $86,000 per year.

Plaintiff Henriquez

26.     In September 2010,  Mr. Henriquez was hired by the Telx Group ("Telx") to be an Installation Technician.

27.     Throughout his employment, and until the time that the discriminatory practices at issue began, Mr. Henriquez was recognized by his peers and superiors as an outstanding employee, and regularly received stellar performance reviews by his managers.

28.     As evidence of his excellence, Mr. Henriquez has received employee recognition awards and has been promoted several times, most recently to the position of Senior Facility Technician in 2017.

DLR Acquires Telx

29.     In or about 2015, DLR purchased Telx in one of the largest acquisitions in the industry.

30.     Thereafter, in 2017, Defendant DLR's acquisition of Telx was finalized and the Plaintiffs became employees of DLR.

31.     In 2017, as part of DLR's acquisition of Telx, Defendant Bamrick became Regional Manager of DLR and Plaintiffs' employer.

32.     Moreover, in 2017, Manuel Pego became the direct supervisor of Defendant Henriquez.

33. Immediately thereafter, with Defendant Bamrick at the helm, a campaign of discriminatory conduct began against Plaintiffs and other dark-skinned DLR employees that included demotions of dark-skinned employees, racial segregation at the workplace, failure to promote dark-skinned employees, unfair discipline targeting dark-skinned employees, a hostile work environment for dark-skinned employees, and retaliation for complaints of discrimination, including, *inter alia*, the unlawful termination of both Plaintiffs from their employment.

## **DLR Discriminates Against the Plaintiffs**

### ***DLR Demotes Plaintiff Saleh***

34. On or around April 2017, when Telx was acquired by Defendant DLR, Plaintiff Saleh's direct supervisor Erik Falk assured him and others that they would remain in the same title as employees for their new employer, Defendant DLR.

35. Relying on Mr. Falk's assurance, Plaintiff Saleh attempted to order new business cards a few days later.

36. In response to his attempt to order business cards, Mr. Falk called Plaintiff Saleh into his office and informed him that his new supervisor Defendant Bamrick had decided to demote Plaintiff from Data Center Operations Manager to Senior Operations Engineer.

37. Defendants provided no explanation for Plaintiff Saleh's sudden demotion.

38. Mr. Falk also informed Plaintiff Saleh that Defendant Bamrick had decided to give the now open position of Data Center Operations Manager to Kevin Groen, a lesser-qualified White facility engineer.

### *DLR Segregates the Workplace Based on Skin Color*

<u>Plaintiff Saleh</u>

39.    Approximately one month after Defendants decided to demote Plaintiff Saleh without any explanation, Defendant Bamrick advised Plaintiff and all other non-managerial employees, all of whom were also dark-skinned and all of whom had been demoted without explanation, that they were no longer allowed to occupy any offices.

40.    Accordingly, Plaintiff Saleh and his similarly situated dark-skinned colleagues were required to collect their belongings from their respective offices and sit together, in shame, at a large communal table, outside of the separated DLR cubicles.

41.    The communal table had no phones or LAN connection, and therefore all who were required to use the communal table were unable to adequately perform their work responsibilities.

<u>Plaintiff Henriquez</u>

42.    For the last two (2) years of Plaintiff Henriquez's employment, Plaintiff Henriquez and his dark-skinned shift partner Mark Zabala were relegated to work the "graveyard shift."

43.    No White DLR employees are assigned to the "graveyard shift."

44.    The "graveyard shift" is considered by all DLR employees to be the least favorable shift because those working that shift are precluded from participating in most of the major day-to-day projects and activities which DLR management uses to justify promotions and pay increases.

45.    Because of this discriminatory and segregated assignment, neither Plaintiff Henriquez nor his shift partner Mr. Zabala were promoted.

46. Upon information and belief, Mr. Zabala has been on the night shift for almost three (3) years and has never been promoted while at DLR.

47. When Plaintiff Henriquez went on temporary leave on or about October 8, 2021, Plaintiff's Henriquez's night shift replacement was another dark-skinned DLR employee named Sharif Brook.

48. By contrast, the DLR employees assigned to the more favorable day shift are exclusively White employees: Donald Nielson, Bruce Lindsay, Mark Cullia, Darius Wachnik and Evan Boccardi.

49. Each of the White employees has been on the day shift for approximately three (3) years, and each of them has less experience working for the Company than Plaintiff Henriquez.

50. Plaintiff Henriquez and his shift partner Mr. Zabala have requested to be transferred to the day shift on several occasions, and most recently at a team meeting that took place on or about April 18, 2020.

51. Defendant Pego assured them both that the shifts would be re-organized by January 2021.

52. However, no such reorganization took place, and the discriminatory shift assignment—which segregates dark-skinned employees to the "graveyard" shift and White employees to the day shift—remained in place as of the date of Plaintiff Henriquez's December 1, 2021 termination.

## *DLR Fails to Promote the Plaintiffs*

### Plaintiff Saleh

53.     In the summer of 2018, Plaintiff Saleh's former position of Data Center Operations Manager at DLR became available to applicants.

54.     In October 2018, unbeknownst to Plaintiff Saleh—and rather than allowing Plaintiff Saleh to return to his former position as Data Center Operations Manager, and rather than providing Plaintiff Saleh with the opportunity to reapply to his former position—Defendant Bamrick advertised the position externally and hired a new White employee named Erik Greiner.

55.     Mr. Greiner was entirely new to the company, having no prior history working for DLR, and did not have the same level of work experience as Plaintiff Saleh.

56.     Nevertheless, Mr. Greiner became the Data Center Operations Manager and Plaintiff Saleh's direct supervisor.

57.     In November 2018, Defendant Bamrick repeated the discriminatory conduct by externally recruiting and hiring Steve Robbins, a White engineer, to the role of Data Center Supervisor.

58.     Instead of announcing the job opening internally, which would have allowed DLR employees with an interest in the job opportunity to apply, DLR quietly recruited for the position outside of DLR without advising DLR employees of the open position.

59.     As a consequence, Plaintiff Saleh and two other qualified dark-skinned employees Brian Baldwin and Ricardo Clark were deprived of the chance at the promotion.

60.     Despite Plaintiff Saleh's, Mr. Baldwin's, and Mr. Clark's repeated attempts to acquire information about and apply to the promotion, DLR did not respond to them or otherwise provide them with information on how to apply to the position of Data Center Supervisor.

61.     Plaintiff was more than qualified for the position of Data Center Supervisor at the time that he was passed over for the opportunity.

Plaintiff Henriquez

62.     In August 2017, the position of Lead Engineer at DLR became available for applicants.

63.     Although the Company was well aware that Plaintiff Henriquez was interested in applying for the position of Lead Engineer, DLR management did not advise him or his similarly situated dark-skinned co-workers of the open position.

64.     Given Plaintiff Henriquez's long tenure with the Company, including his work as a Senior Engineer on the night-shift and his open interest in the position, Plaintiff Henriquez should have been next up for consideration for the promotion.

65.     Nevertheless, in February 2020, DLR quietly promoted Bruce Lindsay, a White DLR employee with less experience than Plaintiff Henriquez and only two (2) years of experience at DLR.

***DLR Unfairly Disciplines Plaintiff Henriquez and Other Dark-Skin Employees***

66.     DLR has a practice of disparately applying rules and policies against dark-skinned employees in ways that greatly disfavor them compared to the way they are applied to the White employees, and systematically singles out the dark-skinned employees for discipline.

DLR Punishes Plaintiff Henriquez for Not Falsifying DLR Records

67.     In November 2019, Plaintiff Henriquez refused to follow a directive from Defendant Pego ordering him to fraudulently backfill one years' worth of documentation involving the DLR Legionnaire cooling tower log-books.

68. Plaintiff Henriquez only agreed to backfill the documents with dates that he knew he was actually at work, but refused to create entries that he knew were false (*i.e.*, involving dates when he was not at work.)

69. A few weeks later, the Department of Health made a surprise visit to DLR and gave the Company a citation for not producing certain documents.

70. After being called into a meeting with Defendant Bamrick and Defendant Pego, Plaintiff Henriquez was given a disciplinary "write-up" and placed on a 60-day performance improvement probation program for his refusal to create knowingly false entries in the log-books.

71. Another DLR manager named Ricardo Montes advised Plaintiff Henriquez that his discipline was unfair.

72. No White DLR employees have been required to falsify documents, and certainly never disciplined for failing to do so.

73. On the contrary, in addition to Plaintiff Henriquez, his dark-skinned shift partner Mr. Zabala was also recently ordered to destroy six (6) months of documents related to the DLR Legionnaire record books, and then made to rewrite the entries with false information.

<u>DLR Punishes Plaintiff Henriquez for Requesting Vacation and Leave</u>

74. On or about December 16, 2019, during a meeting with his supervisors Defendant Pego and Eric Falk, Plaintiff Henriquez was again disciplined due to his request for approved time off.

75. Defendant Pego advised Plaintiff Henriquez that the reason for the disciplinary action was because Plaintiff Henriquez did not provide two weeks' notification and also demonstrated a pattern of "piggy-backing" days off with weekends.

76.    Plaintiff Henriquez explained to Mr. Falk and to Defendant Pego that he did not believe he was violating DLR's company policy and that his approved time off was always requested and approved in advance.

77.    Plaintiff Henriquez further explained that he had been with DLR for approximately 19-years at this time, and that he was very familiar with the Company's procedure for requesting approved time off and had never been reprimanded for failing to comply with that procedure.

78.    Nevertheless, Defendant Pego demanded Plaintiff Henriquez to resend all the past emails for any dates that he had requested time off over the past year, and Plaintiff Henriquez immediately complied.

79.    There was never any follow-up.

80.    By contrast, White DLR employees such as Defendant Pego, Bruce Lindsay, Mark Cullia, Evan Boccardi, Don Neilson, and Darius Wachnik frequently take days off that are connected to weekends, and are never disciplined for such practices.

81.    Furthermore, DLR requires two (2) days' notice in order to take one (1) day off and two (2) weeks' notice in order to take extended vacation time.

82.    Among other examples, in August 2021, Darius Wachnik, a White employee, requested seven (7) days off for vacation only six (6) days in advance, and such request was approved by DLR management with no issue.

     DLR Punishes Dark-Skinned Employees Only for Inspection Log Discrepancies

83.    On or about August 31, 2021, Defendant Pego called a telephone meeting with Plaintiff Henriquez and his colleagues.

84.     At the beginning of the call, Defendant Pego asked everyone to leave the call except for Plaintiff Henriquez, Mr. Zabala, and Mr. Wachnik (who is White and in his sixties.)

85.     Defendant Pego advised them that he had found a written discrepancy within their daily inspection logs, and that the purpose of the call was to reprimand them and advise them that they would be disciplined for documenting the wrong values.

86.     Throughout the call, Defendant Pego's tone was threatening: he spoke aggressively, shouted, and used profanity. He shouted and cursed at them for thirty minutes, at some point yelling, "there are write ups coming for everyone."

87.     Defendant Pego then directed his attention to Mr. Wachnik, the only older employee at DLR, shouting, "I don't care how old you are!"

88.     Defendant Pego ended the call by shouting to all three of them, "I fucking dare you to go to HR… I dare you to go!"

89.     Ultimately, only Plaintiff Henriquez and Mr. Zabala were disciplined with write-ups, while Mr. Wachnik—who is White—was not.

90.     Discrepancies in the inspection logs at DLR are very typical and occur every day, yet Defendant Pego has never reprimanded or disciplined any White employees for such discrepancies.

<u>DLR Has a Different Set of Company Rules for Dark-Skinned Employees</u>

91.     DLR requires non-White employees to abide by rules that are not even company policy.

92.     One example occurred on or about September 26, 2021, when Plaintiff Henriquez was required to take a sick day due to complications from an emergency dental surgery he had undergone over the weekend.

93.     Plaintiff Henriquez contacted Defendant Pego and Mr. Lindsay, the team lead, and explained the situation, and Defendant Pego said it was fine.

94.     However, the next morning, Defendant Pego sent an email to Plaintiff Henriquez requesting a doctor's note.

95.     DLR typically does not require employees to provide doctors' notes when they call in sick for one day.

96.     Defendant Pego has never requested doctor's notes from any of Plaintiff Henriquez's similarly situated White colleagues who have called in sick for one day.

97.     Prior to the Covid-19 pandemic in the spring of 2020, Plaintiff Henriquez had not called in sick for well over one year, while his similarly situated White counterparts regularly call in sick at the last minute.

### *DLR Creates a Hostile Work Environment for Dark-Skinned Employees*

98.     Over the past few years, the environment for dark-skinned employees working at DLR has been permeated with discriminatory intimidation.

99.     The Plaintiffs and their dark-skinned co-workers have been frequently subjected to: screaming fits involving demeaning language and extreme profanity, exposure to racist epithets, race segregation, and life-threatening work.

100.    The White employees are not subject to the same hostile environment.

### Abusive Language and Profanity

101.    DLR management has regularly shouted at and used profanity with dark-skinned employees.

102.     One example of many occurred in December 2018, when Plaintiff Henriquez went to Defendant Pego's office in order to hand deliver his year-end self-assessment and review.

103.     Defendant Henriquez found himself alone with Defendant Pego in his office.

104.     Defendant Pego, who appeared to be enraged at the sight of Plaintiff Henriquez, screamed, "What the fuck do you expect me to do with this now? I wanted this completed yesterday and you're fucking showing up here now? You think I don't have my own shit to do?"

105.     Defendant Pego does not shout at or use such profanity with White employees, which made Plaintiff Henriquez feel all the more worthless and ashamed.

<u>Racist Epithets</u>

106.     DLR management has regularly utilized racist epithets at the workplace.

107.     For example, on or about June 2021, and in Plaintiff Henriquez's presence, Defendant Pego made racially derogatory comments about another DLR employee named Sharif Brook, who is African-American, to Bruce Lindsay, who is White.

108.     Specifically, Defendant Pego stated, "Black guys like him from the South are a little slow."

109.     Plaintiff Henriquez felt humiliated by Defendant Pego's openly racist comments targeting dark-skinned employees.

110.     In or about February 2020, during a DLR team meeting, Evan Boccardi mentioned that there was a woman candidate who had applied for a position within their department.

111.     Defendant Pego stated, "DLR is not hiring that woman. We don't need any more 'Altheas' working here."

112.     By "Althea" Defendant Pego was referring to a dark-skinned woman from Guyana who was employed in another DLR department.

113.     After Defendant Pego openly refused to hire a dark-skinned woman on account of her skin color, DLR instead hired Marc Cullia, a White man, for the open position.

114.     On or about December 22, 2019, after a team meeting held inside the 5th floor Network Operation Center ("NOC") room at JFK12, the office where DLR's facility engineers are stationed, Plaintiff Henriquez mentioned to his team members that he saw Bill Stein on television ringing in the bell at the New York Stock Exchange.

115.     Defendant Pego, who had been listening, stated loudly, "yeah I heard."

116.     Plaintiff Henriquez and his co-workers disregarded Defendant Pego's interjection and continued the discussion.

117.     Defendant Pego then abruptly stood up to leave the room. As he was leaving, he shouted, "fuck Bill Stein that fucking Jew!"

118.     Plaintiff Henriquez and his co-workers fell silent and felt extremely uncomfortable with the overtly racist and anti-Semitic comment, made by a manager at the workplace.

119.     During Plaintiff Saleh's last 6-months working for DLR, Defendant Bamrick made derogatory comments and cracked offensive discriminatory jokes in the presence of Mr. Saleh.

## DLR Management Makes Openly Demeaning Comments about Plaintiff Henriquez

120.     The discriminatory environment at DLR has also involved comments by DLR management to other employees openly discussing the amount of Plaintiff Henriquez's pay in derogatory terms.

121.    On several occasions between 2019 and 2021, Defendant Pego has told Plaintiff Henriquez' White colleagues, including Mr. Lindsay, Mr. Clarke, and Mr. Wachnik, that Plaintiff Henriquez is getting paid "more than he deserves."

122.    Defendant Pego's very public opinion that Plaintiff Henriquez does not deserve to earn as much as his similarly-situated White counterparts on account of his skin color has caused Plaintiff Henriquez to feel undervalued and insignificant.

<u>DLR Requires Dark-Skinned Employees to Do Life-Threatening Work</u>

123.    The hostile work environment at DLR has also involved the obligation of dark-skinned employees to engage in extremely dangerous and life-threatening work, while their White counterparts have not been required to risk their lives in the same way.

124.    For instance, on a very cold and icy day in January 2021, during a monthly generator testing maintenance at 32 Avenue of the Americas, New York, New York, Plaintiff Henriquez's team ran into a discrepancy in that one of the generators would not start.

125.    The maintenance on the generator was therefore canceled and Defendant Pego arranged to come in during Plaintiff Henriquez's shift to try and assist in troubleshooting.

126.    Defendant Pego, along with Plaintiff Henriquez, Mr. Zabala and Mr. Cullia, went up to the 22nd floor, and to the roof where the generator enclosure was stationed.

127.    Defendant Pego first asked Mr. Cullia, who is White, to climb up to the top of the generator and clear the ice buildup over the generator exhaust.

128.    But after climbing to the top and assessing the situation, Mr. Cullia climbed back down and advised Defendant Pego that the top of the generator was covered in a sheet of ice, and that slipping would be deadly, as it would almost certainly result in falling down 22 stories.

129.    Defendant Pego then ordered Mr. Zabala to climb up and to clean the ice buildup on the generator exhaust.

130.    Shocked that Defendant Pego was sending Mr. Zabala up instead of Mr. Cullia and after Mr. Cullia reported the dangerous conditions, Plaintiff Henriquez told Defendant Pego, "This is crazy."

131.    Ultimately, Mr. Zabala slipped so many times on the ladder on the way up and was unable to continue to the top of the generator, that Defendant Pego decided to let the matter go for the time being.

132.    That Defendant Pego ordered Mr. Zabala, rather than Mr. Cullia, after Mr. Cullia's warning, to engage in such life-threatening work demonstrates the little value he has for the lives of dark-skinned people.

133.    A similarly dangerous incident occurred in or about September 2017, when Defendant Pego ordered Plaintiff Henriquez to gather information for a programmable logic control replacement project by taking live power draws from the ninth-floor automatic transfer system at 32 Avenue of the Americas.

134.    There was no personal protective equipment except for gloves and goggles.

135.    Nonetheless, Defendant Pego opened the 480v live automatic transfer system and demanded Plaintiff Henriquez to reach inside and take the power measurements.

136.    Defendant Pego was clearly nervous and uneasy by the danger of the work he was requiring Plaintiff Henriquez to do, so he asked Aminata Sisco, the front desk security guard, to stand at the door and keep watch, stating that her presence was necessary "in case something happens."

137. Plaintiff Henriquez was sweating and scared for his life, knowing that one false move would mean instant and painful death.

138. Ms. Sisco was very nervous as well.

139. But Plaintiff Henriquez, feeling as though he had no choice but to comply, did what Defendant Pego demanded of him.

140. Defendant Pego did not request DLR's White employees to risk their lives engaging in such dangerous tasks.

141. Plaintiff Saleh has also been required to engage in similarly dangerous work on a number of occasions throughout his employment at DLR.

## DLR Retaliates Against the Plaintiffs

### Plaintiff Saleh

142. In December 2018, a month after Plaintiff Saleh and his similarly situated dark-skinned colleagues were deprived of the promotion opportunity to the position of Data Center Supervisor, Plaintiff Saleh learned that he had been passed over and complained to his direct supervisor, Mr. Greiner.

143. To Mr. Greiner, Plaintiff Saleh highlighted DLR's pattern of discriminatory conduct in its hiring and promoting practices, pointing to instances where less-qualified White individuals were awarded jobs instead of more qualified dark-skinned DLR employees.

144. After Mr. Greiner relayed Plaintiff Saleh's complaint to Defendant Bamrick, Mr. Bamrick stated that Plaintiff Saleh "is a thorn in my ass."

145. A month after Plaintiff Saleh made his complaint to Mr. Greiner and Defendant Bamrick stated his disapproval with Plaintiff Saleh for having complained about discrimination, Plaintiff Saleh was abruptly terminated from his employment.

146. On January 14, 2019, at a meeting held by Defendant Bamrick and DLR's head of Human Resources Mr. Gourley, Plaintiff Saleh was told that he was fired.

147. Of significance, Mr. Falk and Mr. Greiner both opposed Defendants' decision to unlawfully terminate Plaintiff Saleh, and in a writing to Plaintiff Saleh, Mr. Falk stated that Defendants' decision to terminate him was unlawful and that he should seek legal counsel.

148. Moreover, to Lead Engineer Leith Hunt, Mr. Greiner stated that Plaintiff Saleh and Mr. Clark (who was also terminated) "got screwed by Paul [Bamrick]" because Defendants unlawfully terminated them.

<u>Plaintiff Henriquez</u>

149. On October 1, 2021, Plaintiff Henriquez submitted a written complaint to DLR's HR Department, complaining of race discrimination at DLR.

150. Immediately thereafter, throughout the week of October 4, 2021, Defendant Pego began doing something he had never done before: he began coming into work every day between 6:20 a.m. and 6:30 a.m., which is one (1) hour before the end of Plaintiff Henriquez's shift.

151. On each of these occasions, Defendant Pego did not say a word to Plaintiff Henriquez, and instead just sat at his desk in the office and stared threateningly at Plaintiff Henriquez until the end of Plaintiff Henriquez's shift.

152. As Defendant Pego only began to do this immediately after Plaintiff Henriquez's complaint to HR, it was an act clearly designed to intimidate and threaten Plaintiff Henriquez.

153. Early in the morning of October 6, 2021, Defendant Pego's best friend and DLR employee Donald Nielson showed up for his shift early and while Plaintiff Henriquez was finishing his shift.

154.     Mr. Nielson sought out Plaintiff Henriquez and said, "What is going on between you and Manny [Pego]?" Plaintiff Henriquez said, "Nothing." Mr. Nielson then stated, "I heard that *something* is going on."

155.     When Plaintiff Henriquez did not respond, Mr. Nielson stated, "Whatever it is, you should just let it go. Manny [Pego] is tough because he feels you get paid a lot of money and you should be doing more."

156.     As Plaintiff Henriquez had not told anyone about the HR complaint, it was evident that Defendants had been speaking to other employees about it while at the same time openly disparaging Plaintiff Henriquez's performance to his peers, and Mr. Nielson's warning to "let it go" clearly came directly from Defendant Pego, his best friend.

157.     Later that day, in the evening of October 6, 2021, Plaintiff Henriquez received a text message from Mark Cullia, another DLR employee and close friend of Defendant Pego.

158.     In the text message, Mr. Cullia warned Plaintiff Henriquez to be careful at work from now on, as he had found a 22. Caliber bullet casing in the employee bathroom on the fifth floor at 60 Hudson Street.

159.     The next evening, Mr. Cullia sent another message to Plaintiff Henriquez advising him that the person who put the bullet in the bathroom was Defendant Pego.

160.     Plaintiff Henriquez was filled with panic and anxiety, as the bullet casing was clearly a death threat meant to be discovered by Plaintiff Henriquez, since Defendant Pego was well aware that it was the only restroom that Plaintiff Henriquez used while working at DLR.

161.     On October 15, 2021, another DLR employee named Jesus Ortiz contacted Plaintiff Henriquez to inform him that Bruce Lindsay, another close friend of Defendant Pego,

had told him that Plaintiff Henriquez had filed a complaint with HR and that people had been openly discussing Plaintiff Henriquez's HR complaint at work.

162.    On December 1, 2021, due to the increased hostility that Plaintiff Henriquez had been experiencing at work after complaining about race discrimination, including threatening behavior from Defendant Pego, disparaging comments about Plaintiff Henriquez made by management to his colleagues, and obvious death threats from management aimed at Plaintiff Henriquez, Plaintiff Henriquez had no choice but to leave his position at DLR.

163.    That is, on December 1, 2021, Plaintiff Henriquez was constructively discharged from his position at DLR.

### *DLR's Terminates Other Dark-Skinned Employees*

164.    DLR's preferential treatment of White employees is also evident in its racist retention policy.

165.    Other than the Plaintiffs, several dark-skinned employees have been terminated from their positions at DLR, including, *inter alia*, Mauricio Menendez, Luis Henriquez, Alejandro Collado, Ricardo Montes and Ramon Santana.

166.    By contrast, upon information and belief, no White DLR employees have been terminated from their employment.

**FIRST CAUSE OF ACTION**
**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW**
**ADMINISTRATIVE CODE § 8-101 *ET SEQ.***
***COLOR AND RACE DISCRIMINATION***
***Against All Defendants***

167.    Plaintiffs repeat each and every allegation in the preceding paragraphs as if set forth fully herein.

168.     Defendants have discriminated against Plaintiffs on the basis of their skin color and race in violation of the NYCHRL by subjecting Plaintiffs to disparate treatment on the basis of their color and race, including, *inter alia*, subjecting them to a hostile work environment, failing to promote them, segregating them, subjecting Plaintiff Henriquez to unfair discipline, and demoting Mr. Saleh.

169.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

170.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress for which they are entitled to an award of monetary damages and other relief.

171.     Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYCHRL for which they are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW
### ADMINISTRATIVE CODE § 8-101 *ET SEQ.*
### *RETALIATION*
### *Against All Defendants*

172.     Plaintiffs repeat each and every allegation in the preceding paragraphs as if set forth fully herein.

173.     Defendants have retaliated against Plaintiffs on the basis of their opposition to discrimination, in violation of the NYCHRL, by subjecting Plaintiffs to adverse actions because they complained about discrimination, including, *inter alia,* terminating their employment.

174. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

175. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress for which they are entitled to an award of monetary damages and other relief.

176. Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYCHRL for which they are entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW**
**ADMINISTRATIVE CODE § 8-101 *ET SEQ.***
***AIDING AND ABETTING COLOR AND RACE DISCRIMINATION***
***Against Defendants Bamrick and Pego***

177. Plaintiffs repeat each and every allegation in the preceding paragraphs as if set forth fully herein.

178. By the actions described above, among others, Defendant Bamrick and Defendant Pego violated the NYCHRL, when they discriminated against the Plaintiffs on account of their race and skin color.

179. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or other economic harm for which they are entitled an award of economic damages and other relief.

180. As a direct and proximate result of Defendants' unlawful conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer severe mental anguish and emotional distress for which they are entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW**
**ADMINISTRATIVE CODE § 8-101 *ET SEQ.***
***AIDING AND ABETTING RETALIATION***
***Against Defendants Bamrick and Pego***

181. Plaintiffs repeat each and every allegation in the preceding paragraphs as if set forth fully herein.

182. By the actions described above, among others, Defendant Bamrick and Defendant Pego violated the NYCHRL, when they retaliated against the Plaintiffs after they opposed discrimination.

183. As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or other economic harm for which they are entitled an award of economic damages and other relief.

184. As a direct and proximate result of Defendants' unlawful conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer severe mental anguish and emotional distress for which they are entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request judgment as follows:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the City of New York;

B.      An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages;

E.      An award of back pay for Defendants' violations of NYCHRL;

F.      An award of front pay for Defendants' violations of NYCHRL;

G.      An award of compensatory damages in an amount that would fully compensate Plaintiffs, plus prejudgment interest, for the economic loss, mental anguish, emotional pain and suffering, in an amount to be determined at trial;

H.      An award of punitive damages to Plaintiffs in an amount that would punish Defendants for the excessive, extreme, willful, wanton, reckless, and negligent misconduct alleged in this Complaint that would effectively deter Defendants from future discrimination and other unlawful behavior, in an amount to be determined at trial;

I.      An award of all penalties available under the applicable laws;

J.      Prejudgment interest on all amounts due;

K.      An award of costs that Plaintiffs incur in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

L.      Such other and further relief as the Court may deem just and proper.

Dated:     New York, New York
              December 30, 2021

Respectfully submitted,

**EISNER DICTOR & LAMADRID, P.C.**

By: _____

Maria L. Chickedantz, Of Counsel
39 Broadway, Suite 1540
New York, NY 10006
Tel. (212) 473-8700
Fax: (212) 473-8705

maria@eisnerdictor.com