UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MONER SALEH and JOSE HENRIQUEZ,

Plaintiffs,

-v-

DIGITAL REALTY TRUST, INC., PAUL BAMRICK,
and MANUEL PEGO, *in their individual capacities*,

Defendants.

---

21 Civ. 9005 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Moner Saleh ("Saleh") and Jose Henriquez ("Henriquez") each claim to have
suffered from discrimination, a hostile work environment, and retaliation in the course of their
employment at corporate defendant Digital Realty Trust, Inc. ("Digital Realty"), in violation of
the New York City Human Rights Law New York, City Administrative Code §§ 8-101, *et seq.*
("NYCHRL"). Each plaintiff alleges that a particular supervisor—for Saleh, defendant Paul
Bamrick ("Bamrick"), and for Henriquez, defendant Manuel Pego ("Pego")—was the main
perpetrator of the unlawful conduct directed at him.

Defendants now move to sever plaintiffs' claims; to compel arbitration as to Henriquez's
claims; and to dismiss Henriquez's claims. For the reasons below, the Court grants the motion to
compel arbitration of Henriquez's claims and therefore severs them from Saleh's claims, which
will move forward in this Court. The Court denies the motion to dismiss Henriquez's claims,
which are instead stayed pending the outcome of arbitration.

## I.     Relevant Factual Background

### A.     The Parties

Saleh is a "dark-skinned person of Arab ethnicity."  Dkt. 15 (Amended Complaint, or "AC") ¶ 6.  Henriquez is a "dark-skinned person of Hispanic ethnicity."  *Id.* ¶ 9.  Bamrick and Pego are each "a White male."  *Id.* ¶¶ 13, 17.

Digital Realty operates three data centers in Manhattan, including, relevant here, one at 111 8th Avenue and one at 60 Hudson Street.  Dkt. 25 ("Gourley Decl.") ¶ 3.  The data centers house computer networks and electronic communication systems for businesses that lease the space from Digital Realty.  *Id.* ¶ 4.

In 2017, Digital Realty acquired Telx Group ("Telx"), where plaintiffs had previously worked.  AC ¶ 30.  At the time, Saleh, who had worked at Telx since 1999, was a data center operations manager; and Henriquez, who had worked at Telx since 2010, was a senior facility technician.  *Id.* ¶¶ 20, 25–26, 28.  As part of the acquisition, Bamrick became Digital Realty's regional manager; Pego became Henriquez's direct supervisor; and non-parties Kevin Groen and Erik Falk became Saleh's direct supervisors.[1]  In October 2018, Erik Geiner became Saleh's direct supervisor.  *Id.* ¶¶ 31–32, 34, 53–56.

Following the acquisition, plaintiffs allege, Digital Realty embarked upon "a campaign of discriminatory conduct . . . against Plaintiffs and other dark-skinned [Digital Realty] employees," by way of demotions, failures to promote, segregation, unfair discipline, a hostile work environment, and retaliation, including by terminating plaintiffs.  *Id.* ¶ 33.  As reviewed below,

---

[1] Henriquez describes Falk as a supervisor of his in one paragraph of the AC, AC ¶ 74, but it is unclear when or in what capacity Falk exercised any supervision over him.

that alleged discrimination was mainly carried out by Bamrick against Saleh, and by Pego against Henriquez.

### B.    Saleh's Experience at Digital Realty

At all relevant times, Saleh worked out of Digital Realty's 8th Avenue location.  Gourley Decl. ¶ 7.  Saleh alleges that, after Digital Realty acquired Telx in April 2017, Bamrick demoted him from "data center operations manager" to "senior operations engineer" without explanation. AC ¶¶ 36–38.  Approximately one month later, Saleh claims, Bamrick advised him and his "similarly situated dark-skinned colleagues" to vacate their private office spaces and work alongside one another at a communal table, without access to phones or local area network connection.  *Id.* ¶¶ 39–41.  Further, Saleh claims, during his last six months working for Digital Realty (from mid-2018 until January 2019), Bamrick made derogatory comments and cracked offensive jokes in Saleh's presence.  *Id.* ¶ 119.

In October and November 2018, Saleh claims, Bamrick hired white persons less qualified than Saleh and other "qualified dark-skinned employees" to the supervisory roles of "data center operations manager" (Saleh's former title) and "data center supervisor," declining to advertise within Digital Realty and afford Saleh and other non-white employees the opportunity to apply for the posts.  *Id.* ¶¶ 53–57.  In December 2018, Saleh claims, he complained to Greiner about having been passed over for promotion, alleging discriminatory hiring and promoting practices. *Id.* ¶¶ 142–43.  After that comment was relayed to Bamrick, he described Saleh as "a thorn in my ass."  *Id.* ¶ 144.

On January 14, 2019, at a meeting with Bamrick and Digital Realty's head of human resources, Saleh was terminated—over the objections of Greiner and Falk.  *Id.* ¶¶ 145–46.  The AC does not describe the basis, if any, Digital Realty offered for the termination.

C.    **Henriquez's Experience at Digital Realty**

1.    **Allegations of Discrimination**

At all relevant times, Henriquez worked out of Digital Realty's 60 Hudson Street data center. Gourley Decl. ¶ 11. He alleges that, for the last two years of his employment, which ended in December 2021, he and "his dark-skinned shift partner(s)" were relegated to work the "graveyard shift" (to which no white employee was assigned), depriving them of the opportunity to participate in meaningful daytime projects and activities. AC ¶¶ 42–50. Pego allegedly assured Henriquez that the shifts would be reorganized, but they never were. *Id.* ¶¶ 51–52. Henriquez also alleges that Digital Realty hired a less-experienced white employee to the position of lead engineer, declining to advertise to and afford Henriquez the opportunity to apply for it.[2] *Id.* ¶¶ 62–65. Further, Henriquez claims, Pego unfairly disciplined him for falsifying records, taking time off for vacation and sickness, and making discrepancies in his inspection logs, and subjected him to screaming fits, demeaning language, "life-threatening work" (for *e.g.*, requiring Henriquez to climb up a generator on the 22nd floor of a building to clear ice buildup in slippery conditions, and reaching inside a "480v live automatic transfer system" to take power measurements),[3] and racial epithets. *Id.* ¶¶ 67–70, 74–78, 83–89, 91–97, 102–105, 107–117, 121, 124–39.

On October 1, 2021, Henriquez claims, he complained of race discrimination to Digital Realty's human resources department ("HR"). *Id.* ¶ 149. The following week, Henriquez alleges, Pego began to go to work early in the morning—so as to overlap with the end of

---

[2] The AC does not specify who made the decision not to promote from within.

[3] Saleh claims to have been "required to engage in similarly dangerous work on a number of occasions throughout his employment" at Digital Realty, AC ¶ 141, but does not specify when or at whose behest.

Henriquez's graveyard shift—and "stare[] threateningly" at Henriquez until his shifts ended. *Id.* ¶¶ 150–52. On October 6, 2021, other Digital Realty employees friendly with Pego warned Henriquez to "let it go" and "be careful," as Pego, to threaten Henriquez, had apparently placed a .22 Caliber bullet casing in the employee bathroom. *Id.* ¶¶ 153–60.

On December 1, 2021, based on the alleged hostile treatment he suffered on the job, Henriquez ceased employment at Digital Realty. He claims to have been constructively discharged. *Id.* ¶¶ 162–63.

### 2.    Commitment to Arbitrate

Digital Realty requires employees, via an annual attestation process, to read and acknowledge that they agree to comply with myriad company policies, including the arbitration program it runs. That program is set out in the company's Dispute Resolution Agreement ("DRA"). Dkt. 26 ("Stumph Decl.") ¶ 4. Signatories to the DRA agree:

> to resolve exclusively through binding arbitration any and all claims, disputes, or controversies that either you may have against the Company or that the Company may have against you arising out of, relating to, or having any connection to your application for employment, your employment, and/or the cessation of your employment with the Company[,] . . . . includ[ing] but . . . not limited to claims related to: unpaid wages, overtime, or other compensation; discrimination or harassment on the basis of race, sex, age, national origin, religion, disability, or any other protected category; breach of contract; unlawful retaliation; [and] wrongful discharge.

*Id.*, Ex. B.

Digital Realty administers employees' annual attestations, which are completed online, through a third-party platform called ServiceNow. *Id.* ¶ 4. ServiceNow is configured to send to each employee an email with a link to the annual attestation process, with each employee assigned a unique serial number and link. Only by clinking on the link in the email (which an employee may access only after logging onto Digital Realty's network using her unique sign-on credentials) may an employee complete the process. *Id.* ¶¶ 5–7. The attestations include, in

relevant part, three radio buttons an employee must click to (1) access the DRA, (2) confirm that she has "read th[e] agreement," and (3) acknowledge that she understands and agrees "to be bound by the terms of the Company's Dispute Resolution Agreement." *Id.* ¶ 14. An annual attestation is not complete unless an employee clicks all three radio buttons. *Id.* ¶ 10.

As part of the 2019 annual attestation, ServiceNow sent Henriquez[4] links to complete the process on November 12, 2019, December 9, 2019, and February 6, 2020. *Id.* ¶ 11. The February 6 email assigned Henriquez a unique serial number of 92145e61db32849481f474dfaa96191c. *Id.* ServiceNow's records show that, on February 11, 2020, Henriquez used the link in the February 6 email to access the 2019 attestation form. *Id.* ¶ 12. A copy of the DRA Henriquez submitted further shows that the radio buttons indicating that Henriquez had accessed, read, and agreed to be bound by the DRA had been marked (*i.e.*, clicked). *Id.*, Ex. B. Although Henriquez's signature does not appear on the DRA—agreement to which is instead manifested by clicking the appropriate buttons—the DRA includes the unique serial number assigned to Henriquez. *Id.* ServiceNow's records describe the "2019 US Attestation" assigned to "Jose Henriquez"—including the three radio buttons indicating access, acknowledgment, and agreement to the DRA—as "complete" as of 8:47 p.m. on February 11, 2020. *Id.*, Ex. C.

## II.    Procedural History

On October 4, 2021, Saleh filed an employment discrimination case against Digital Realty and Bamrick in New York state court, claiming violations of the New York State Human Rights Law, N.Y. Executive Law §§ 290, *et seq.* ("NYSHRL") and NYCHRL. Dkt. 1. On

---

[4] It is undisputed that Saleh never signed the DRA. Dkt. 24 at 9 n.5. The Court accordingly reviews the arbitration process solely in connection with Henriquez.

November 2, 2021, defendants removed the action to this Court based on diversity jurisdiction.[5] *Id.* On November 5, 2021, this Court noticed an initial pretrial conference, at first set to occur on December 1, 2021, but later rescheduled. Dkts. 6, 8. On December 9, 2021, Digital Realty and Bamrick answered, Dkt. 11, and the case was automatically referred to the District's mediation program, prompting this Court to adjourn the initial pretrial conference. Dkts. 13, 16.

On January 4, 2022, Saleh amended the complaint, adding Henriquez as a plaintiff and Pego as a defendant, and dropping the NYSHRL claims. Dkt. 15. On February 14, 2022, following multiple extensions, defendants filed the instant motions to sever, compel arbitration, and dismiss. Dkt. 23. In support, defendants filed the declaration of Brian Gourley, Digital Realty's senior HR business partner, Dkt. 25, and Fred Stumph ("Stumph"), its senior director of governance and assurance, Dkt. 26. Also on February 14, 2022, defendants filed an answer to Saleh's claims in the AC—which, unlike Henriquez's claims, defendants do not argue must be arbitrated. Dkt. 27; *see supra* n.4. On March 1, 2022, the Court was notified that court-ordered mediation was unsuccessful. It set an initial pretrial conference for March 18, 2022. Dkt. 29.

On March 9, 2022, the Court granted the parties' joint request to adjourn the initial pretrial conference until one week after a decision on the motion to sever and, in Henriquez's case, compel arbitration. Dkt. 36. On March 11, 2022, plaintiffs opposed these motions, submitting declarations from themselves and their counsel, Maria Chickedantz. Dkts. 37

---

[5] Diversity jurisdiction is proper under 28 U.S.C. § 1332. Plaintiffs each seek more than $75,000 in damages and are residents of New York; whereas the individual defendants are residents of New Jersey; and the corporate defendant is a Maryland corporation with Texas headquarters. Dkt. 15 ¶¶ 9–13.

("Opp'n Mot."), 38 ("Chickedantz Decl."), 39–40.  On March 30, 2022, defendants replied, and filed a reply declaration from Stumph.  Dkts. 45–46.

## III.    Discussion

### A.  Motion to Compel Arbitration as to Henriquez

#### 1.        Legal Standard

The Federal Arbitration Act ("FAA") provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate disputes." *Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).  Congress enacted the FAA to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974) (internal quotation marks and citation omitted).

In resolving a motion to compel arbitration, a court must determine: (1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) where some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration. *See Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008).

On a motion to compel arbitration under the FAA, "the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, we may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, Nat'l Ass'n v. VCG*

*Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (internal quotation marks omitted).

The party moving to compel arbitration "must make a *prima facie* initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order). The moving party need not "show initially that the agreement would be enforceable, merely that one existed." *Id.* Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)).

### 2.    Application

Henriquez does not dispute that, had he signed the DRA, he would need to pursue his claims in private arbitration. But Henriquez disputes that he signed the DRA in the first place. Henriquez attests that "[a]t no point" was he "ever presented with or provided with a copy of the DRA" or did he ever "read, acknowledge, or agree to be bound by [its] terms." Dkt. 39 ¶ 4. This outright denial, standing alone, would not necessarily be an insufficient basis on which to deny the motion to compel arbitration. *See Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022). But it must be considered alongside all relevant admissible evidence, which may refute the denial. "[W]here 'the facts alleged' in a nonmovant's declaration 'are so contradictory that doubt is cast upon their plausibility,' then absent other evidence, granting the motion to compel may be appropriate." *Id.* (quoting *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (per curiam)). To bolster his denial, Henriquez attempts to discredit the digital records evidencing that he signed the DRA.

His arguments—developed by his lawyer in a series of email exchanges between counsel predating the instant motion—are specious. Henriquez's premise is that the DRA bearing the unique serial number assigned to him has been fabricated. The argument follows from defense counsel's having furnished Henriquez's counsel with what the latter describes as "materially altered" versions of the DRA in early and late January 2020. On January 8, 2020, defense counsel provided Henriquez's counsel screenshots showing the "user view" of the attestation form (*i.e.*, the images an employee would see when accessing and completing the form) that does not have the three relevant radio buttons clicked or bear Henriquez's unique serial number; across the top, the document reads "Preview – 2019 Attestation." *See* Chickedantz Decl. ¶ 4, Exs. A-1, A-7, B. On January 27, 2020, after Henriquez's counsel pointed out the missing "clicks" in the January 8 screenshots, defense counsel followed up with "additional documentation"—including screenshots of the actual, fully clicked-through, DRA, which lists Henriquez's serial number, and lacks the "Preview – 2019 Attestation" language. *See id.*, Exs. A-2, A-3, F. But at no point did defense counsel suggest that each document purported to show the DRA Henriquez signed. As counsel explained contemporaneously with his furnishing of the signed DRA, the first set of screenshots revealed what a user would see when submitting the attestation, and the latter showed what ServiceNow's records showed Henriquez actually submitted. *Id.*, Ex. A-3. Accordingly, Henriquez's argument that defense counsel "materially altered" the documents rests on a blatantly faulty premise. Henriquez has not put forth any evidence credibly indicating that defense counsel tried to pull a fast one over Henriquez's counsel by (sloppily) producing two clearly different documents and suggesting that they ever were—or supposed to be—the same.

Henriquez attempts to add to the specter of misfeasance by pointing out that the records showing that he clicked the radio buttons, along with various other radio buttons he clicked as part of the 2019 attestation process, bear an identical timestamp: 8:47:25 p.m. He submits that it is "humanly impossible" to click so many buttons within a span of a second, and therefore fabricated. Opp'n Mot. at 17–18. But the timestamps identify when the attestation was *submitted* once completed—not when each individual radio button was clicked. Indeed, defendants have explained that ServiceNow simply does not create internal records each time a radio button within an annual attestation (which comprises many forms and many radio buttons) has been clicked; it records the time an attestation, as a whole, has been submitted. *See* Dkt. 46 ¶¶ 11–14.

That explanation is corroborated by the face of the records. The records identify a single source type—"Assessment Metric Type: 2019 US Attestation"—and, within that group, identify in individual line items "Metric Definition[s]," which appear to describe the radio buttons a user must click through when completing the attestation (*e.g.*, "metric definitions" include, for example, "Click to continue," "I have read this policy," "I understand the Insider Trading Policy," etc.). *See* Chickedantz Decl., Ex. E. Each line item lists the time at which it was "[u]pdated by" Henriquez (identified by his DigitalRealty email address, jhenriquez@digitalrealty.com) as 8:47 p.m. *Id.* The clear upshot is that the "2019 US Attestation," as a whole, was "updated" when Henriquez submitted it: 8:47 p.m on June 11, 2020. *Id.* Henriquez's ungrounded speculation that ServiceNow's records create a timestamp in real-time the moment a user clicks a button—rather than when the user submits a completed form—is unconvincing. It does not generate an issue of fact sufficient to defeat plaintiffs' motion. *See Barrows*, 36 F.4th at 51 ("[A] party's declaration will not create a material issue of

fact in those rare cases where it is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *Gonder v. Dollar Tree Stores, Inc.*, 144 F. Supp. 3d 522, 528 (S.D.N.Y. 2015) ("Nothing in the record (other than [plaintiff's] bald assertion to the contrary in his opposition) suggests that this document is anything other than what it appears to be—namely, the executed Agreement between [plaintiff] and [defendant].") (internal footnote omitted).

Henriquez's final attempt to discredit the records demonstrating that he signed the DRA rests on a ServiceNow record regarding a "Confidential Phone Policy" that was "updated by" someone with a different email address than Henriquez's. *See* Chickedantz Decl., Ex. E. It is unclear, on this record, precisely what to make of that fact. But it is ultimately beside the point, as the "Confidential Phone Policy" is distinct from the three decisive records here: those indicating that Henriquez accessed, read, and agreed to arbitrate his employment discrimination claims. These records *were* "updated" only by someone using Henriquez's email address (namely, Henriquez). That undisputed fact, in conjunction with the fact that the executed DRA bears Henriquez's unique serial number, is sufficient to demonstrate that Henriquez assented to the DRA. That is so despite his signature not appearing on the DRA, which is typical for these types of online agreements. *See Meyer v. Uber Techs.*, 868 F.3d 66, 75 (2d Cir. 2017) ("Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'") (citing cases); *Gonder*, 144 F. Supp. 3d at 528 (finding no dispute of fact as to whether an employee signed an arbitration agreement based on records showing that an employee accessed an electronic portal containing hiring paperwork and signed the agreement after using a unique password to access the documents, despite the employee alleging that he did not recall signing the documents).

The Court will not indulge Henriquez's speculation that the appearance of someone other than Henriquez having updated an irrelevant employment record raises a credible dispute as to whether Henriquez signed the DRA. *See Barrows*, 36 F.4th at 51 ("[A] party 'normally does not show the existence of a genuine issue of fact . . . merely by making assertions that are based on speculation or are conclusory.'") (quoting *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021)). The Court finds, decisively, that he did. Accordingly, defendants' motion to compel arbitration as to Henriquez's claims is granted.

### B.   Motion to Sever

That Henriquez's claims must be resolved in arbitration whereas Saleh may pursue his in court compels that the plaintiffs' claims be severed. *See Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) ("If some claims are non-arbitrable, while others are arbitrable, then we will sever those claims subject to arbitration from those adjudicable only in court."); *Aviation Fin. Co. v. Chaput*, No. 14 Civ. 8313 (CM), 2015 WL 13203653, at *12 (S.D.N.Y. Mar. 12, 2015) ("I must consider each of Plaintiffs' causes of action in turn, examining the underlying factual allegations to determine whether each cause of action is, in part or whole, arbitrable."); *Snyder v. Wells Fargo Bank, N.A.*, No. 11 Civ. 4496 (SAS), 2011 WL 6382707, at *5 (S.D.N.Y. Dec. 19, 2011) ("Finally, there is no question that while it may not be the most efficient means of dispute resolution, portions of a claim may proceed under arbitration while others are advanced through litigation when that reflects the agreement of the parties."); *Smith v. Dolgencorp, LLC*, 16 Civ. 959, 2017 WL 818570, at *4 (N.D. Ala. Mar. 2, 2017) ("[T]he court concludes that a severance based upon judicial economy is warranted because of the widely diverging procedural tracks that Ms. Smith's claims will follow in arbitration versus those of Mr. Richey that will proceed in litigation before this court.").

However, even if Henriquez had not committed to arbitrate, for the reasons below, the factual differences among his and Saleh's cases would have—eventually—required that the cases be severed for trial.

### 1.    Legal Standard

Rule 21 permits a court to "sever any claim against a party." Fed. R. Civ. P. 21. *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1082 (2d Cir. 1988) ("The decision whether to grant a severance motion is committed to the sound discretion of the trial court."). "The caselaw of this Circuit has established that 'Rule 21 permits a court to add or drop parties to an action when doing so would serve the ends of justice and further the prompt and efficient disposition of the litigation.'" *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 214 F.R.D. 152, 154 (S.D.N.Y. 2003) (quoting *German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1400 (S.D.N.Y.1995)).

In determining whether to sever, courts in this District consider "the two requirements of [Federal] Rule [of Civil Procedure] 20"—namely, whether the claims (1) arise out of the same transaction or occurrence, and (2) present common questions of law and fact—and "additional factors, including [3] whether severance will serve judicial economy; [4] whether prejudice to the parties would be caused by severance; and [5] whether the claims involve different witnesses and evidence." *Pena-Sanchez v. New York City*, No. 22 Civ. 4942 (LTS), 2022 WL 2954367, at *2 (S.D.N.Y. July 26, 2022) (quoting *Kehr v. Yamaha Motor Corp.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008)); *see also Crown Cork & Seal Co., Inc. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, 288 F.R.D. 331, 332–33 (S.D.N.Y. 2013); *Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*, 806 F. Supp. 2d 712, 720 (S.D.N.Y. 2011). "Severance requires the presence of only one of these conditions." *Lewis v. Triborough Bridge & Tunnel Auth.*, No. 97 Civ. 607

(PKL), 2000 WL 423517, at * 2 (S.D.N.Y. April 19, 2000) (citing *Ricciuti v. N.Y.C. Transit*, 796 F. Supp. 84, 86 (S.D.N.Y. 1992)).

### 2.    Application

#### a.    Same transaction or occurrence; common facts

In determining the meaning of the term "transaction or occurrence" under Rule 20, "many courts have drawn guidance from the use of the same term in Rule 13(a), applying to compulsory counterclaims." *Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 228 (E.D.N.Y. 2013) (collecting cases); *see also Peterson v. Regina*, 935 F. Supp. 2d 628, 637–38 (S.D.N.Y. 2013). In the Rule 13(a) context, the Second Circuit applies the "'logical relationship' test." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004). That is, courts are to look to the logical relationship between the claims and determine "whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1979).

Plaintiffs' argument that their separate claims arise out of the same transaction or occurrence is premised on the notion that the two plaintiffs suffered from a coordinated campaign of discrimination from the top. *But see Tardd v. Brookhaven Nat. Lab'y*, No. 04 Civ. 3262 (ADS), 2007 WL 1423642, at *10 (E.D.N.Y. May 8, 2007) ("As an initial matter, other courts have expressed skepticism that such policy or practice claims are appropriate outside of class-action lawsuits."). The AC, however, does not plausibly allege that the discrimination plaintiffs faced was part and parcel of the same nucleus of unlawful conduct as would warrant joinder. Saleh's claims arise principally from *Bamrick*'s alleged bad acts, presumably at the 8th Avenue data center—namely, his alleged discriminatory hiring and promotion decisions, race-based segregation of employees, and derogatory comments, as well as the alleged retaliatory

termination of Saleh after he complained to HR. *See supra* Section I.A. By contrast, Henriquez's claims arise principally from *Pego*'s alleged bad acts at the 60 Hudson Street location—namely, his alleged discriminatory assignment of work shifts, and the abusive and threatening day-to-day work environment to which he subjected Henriquez, ultimately resulting in Henriquez's constructive discharge. *See supra* Section I.B.

Plaintiffs respond that Digital Realty's offices acted as a single "campus" where the parties worked. This characterization is conclusory and unsupported by the AC. The AC is silent as to precisely where the parties worked. Plaintiffs first develop the notion of an integrated "campus" for the first time in their declarations in opposition to severance. *See* Dkts. 37, 39–40.

But even assuming *arguendo* that the Court could consider factual averments in party declarations on a motion to sever,[6] these, viewed as a whole, would not avail plaintiffs here. The one declarant who squarely addresses the point, Digital Realty's senior HR business partner, Brian Gourley, attests with specificity that Saleh worked solely out of Digital Realty's 8th Avenue location, whereas Henriquez and Pego worked solely out of its Hudson Street location. Dkt. 25 ¶¶ 7–12. And although Bamrick, in his comparatively senior role than Pego's, is alleged to have overseen operations at each of the relevant Digital Realty locations, he "was not involved in the day-to-day operations of the data center or the managing of employees." *Id.* ¶ 6; AC ¶ 14.

Plaintiffs' allegations as to common perpetrators are also problematic. Saleh's claims put him in the same room as Bamrick, who, at various points in the AC, is described as Saleh's "new supervisor," AC ¶ 36, and as having "advised [Saleh]" and other "dark-skinned" non-managerial

---

[6] *Accord Allstate Ins. Co. v. Electrolux Home Prod., Inc.*, No. 17 Civ. 391 (JCH), 2017 WL 10718329, at *3 (D. Conn. Sept. 18, 2017) (noting that "[c]ourts take allegations in a complaint as true for purposes of deciding a motion to sever," declining to consider evidence outside of the complaint "at this early stage of the proceedings before the parties have had the opportunity for factual development through discovery," and collecting cases).

employees who "had been demoted without explanation" (a group that does not include Henriquez, who had never been demoted) to vacate their offices and begin working at an ill-equipped communal table, *id.* ¶ 39, "made derogatory comments and cracked offensive discriminatory jokes in the presence of Mr. Saleh," *id.* ¶ 119, and participated in the meeting at which Saleh was terminated, *id.* ¶ 146.  But Henriquez does not make any claim that Bamrick even had *contact* with him—let alone was responsible for any discrimination he faced.  The closest the AC gets is its high-level descriptions of Digital Realty's promotion practices: that (1) Bamrick "made personnel decisions" including those "related to . . . promoting," *id.* ¶ 15, and (2) Digital Realty promoted a less-qualified white employee without affording Henriquez the opportunity to apply, *id.* ¶¶ 62–65.  But unlike Saleh's failure-to-promote claim, which identifies Bamrick as the relevant decisionmaker, *id.* ¶¶ 53–57, Henriquez's failure-to-promote claim does not do so.

Also insufficiently pled is Saleh's claim to have been ordered to engage in dangerous work akin to the work that Henriquez alleges Pego required him to do.  *See* AC ¶ 141.  The AC does not identify who ordered Saleh to do so such work, or what Saleh was ordered to do.  It also does not allege that *Pego* had anything to do with any such orders.  There is no allegation that these orders came from persons who ordered Hernandez to engage in dangerous work.  The AC's allegations on this point are far too general to plausibly support a link between Bamrick's allegedly wrongful treatment of Saleh, and Pego's allegedly wrongful treatment of Henriquez.

Viewing the assembled allegations together, it does not describe coordinated misconduct towards the two plaintiffs.  It suggests misconduct in different silos: with Bamrick allegedly discriminating against Saleh, and Pego allegedly discriminating against Henriquez.  Notably too, the AC's pleadings that the misconduct towards the two plaintiffs scarcely overlapped in time:

17

Saleh's employment *ended* in January 2019—around when Henriquez's alleged discrimination *began.* *See* AC ¶¶ 42–50, 145–46, 162–63.

Under these circumstances, where plaintiffs bring different claims naming different perpetrators situated in different offices occurring during different time periods, there is no basis to claim "that the [plaintiffs'] claims are related in any respect other than the fact that they both worked for the same company and they are both based on race discrimination." *Morris v. Northrop Grumman Corp*, 37 F. Supp. 2d 556, 581 (E.D.N.Y. 1999). Courts in this Circuit routinely sever claims by plaintiffs on similar facts. *See, e.g., id.*; *Hannah v. Wal-Mart Stores, Inc.*, No. 12 Civ. 1361 (VAB), 2017 WL 68617 (D. Conn. Jan. 6, 2017); *Cestone v. Gen. Cigar Holdings, Inc.*, No. 00 Civ. 3686 (RCC) (DF), 2002 WL 424654, at *3 (S.D.N.Y. Mar. 18, 2002) (severing claims where, *inter alia*, "Plaintiffs did not work at the same location or with the same people, they were employed in entirely different capacities"); *cf. Tardd*, 2007 WL 1423642, at *6, *10 (separating defendants' trials under Rule 42, which "consider[s] the same factors" as Rule 21, where "plaintiffs worked in different departments, for different people, and allege different factual circumstances giving rise to their allegedly discriminatory treatment").

   *b.*   *Other considerations*

The remaining considerations under Rule 21 also favor eventual severance.

First, severing the claims would mitigate against the risk of prejudice. Plaintiffs' claims against the individual defendants arise in different circumstances and are of different severity and specificity. Lumping these disparate claims together could unfairly prejudice either side. *Morris*, 37 F. Supp. 2d at 581; *see also Cestone*, 2002 WL 424654, at *3 (severing claims where one plaintiff had claims against two defendants and second plaintiff had claims against only one defendant); *M. Ropfogel v. Wise*, 112 F.R.D. 414, 416 (S.D.N.Y. 1986) (same where danger of

admitting evidence against one party that was inadmissible against the other risked influencing the jury); *Noel Pane v. Town of Greenburgh*, No. 07 Civ. 3216 (LMS), 2012 WL 12886971, at *3 (S.D.N.Y. Mar. 21, 2012) ("Furthermore, given the salacious nature of the allegations against Ward, it is likely that Gramaglia would suffer prejudice if the jury were to conclude that Ward did, in fact, engage in the 'extreme and outrageous' conduct alleged by Pane."). Adjudicating this case as a single lawsuit would result in "one long, combined trial in which the Court must constantly caution the jury to not consider evidence that is irrelevant or inadmissible against a particular Defendant." *Cestone*, 2002 WL 424654, at *3.

Furthermore, plaintiffs will likely "need separate documentary evidence and witnesses to prove their claims." *Id.* The AC does not claim that employees at one location worked at others, such that an employee at the 8th Avenue location could testify as to Henriquez's claims, or that an employee at the Hudson Street location could testify as to Saleh's. *See id.* (severing claims after noting, *inter alia*, that "Cestone would have to call her colleagues at Club Macanudo and the Chief Executive Officer to substantiate her claims[, whereas] Hansen has no need for these witnesses and instead would have to call colleagues at the Executive Offices, who have no knowledge of Cestone's distinct claims"). Plaintiffs attest that they discussed issues of discrimination at Digital Realty with two other employees—Brian Baldwin ("Baldwin") and Ricardo Clarke ("Clarke"). *See* Dkts. 39 ¶¶ 16–17; 40 ¶¶ 15–16. But neither Baldwin nor Clarke overlapped with Henriquez at Digital Realty when he claimed to have suffered discrimination there. *Compare* Gourley Decl. ¶¶ 9–10, 25 (Baldwin worked at Digital Realty until July 2018; Clarke until August 2019), *with* AC ¶¶ 42–50 (Henriquez's alleged discrimination occurred in the two years preceding his December 2021 constructive discharge). There is little reason to view the fact of these discussions as significant evidentiary mucilage

supporting trying the plaintiffs' claims together. And plaintiffs do not suggest anywhere that any of the other employees identified in the AC (Mark Zabala, Donald Nielson, Bruce Lindsay, Mark Cullia, Darius Wachnik, and Evan Boccardi) have evidence relevant to both plaintiffs' claims.[7] The disparate nature of the evidence that the plaintiffs' claims would call upon favors severing their trials, to promote efficiency.

For the foregoing reasons, even if Henriquez's claims were not required to be resolved in arbitration, the factual separateness of, and differences among, the plaintiffs' cases would have required their severance prior to trial.

### C.  Motion to Dismiss

The Court denies defendants' motion to dismiss Henriquez's claims. The Second Circuit has held that that "the text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested." *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015). Such a stay is particularly appropriate here, because it will expedite this case by enabling the prompt arbitral resolution of Henriquez's claims and by deferring appellate review until after the arbitration has concluded. Accordingly, the Court stays the case as to Henriquez's claims, pending their arbitration. Saleh's claims, which are not to proceed to arbitration, will continue before this Court.

### CONCLUSION

For the foregoing reasons, defendants' motions to compel arbitration of Henriquez's claims is granted. These claims are stayed pending the outcome of arbitration. The Court grants the motion to sever the claims of the two plaintiffs. The Court denies the motion to dismiss

---

[7] Conceivably there would be some overlapping documentary evidence—for example, background evidence about the corporate defendant. Such is insufficient to justify joining the two plaintiffs' cases, given their factual separateness.

Henriquez's claims.  The Clerk of Court is respectfully directed to terminate the motions pending

at docket entries 23, 41, and 42.  The Court will, by separate order, set an initial pretrial

conference as to Saleh's claims.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: August 5, 2022
New York, New York